89 So.2d 747

**STATE of Alabama**

v.

**PAN–AM SOUTHERN CORPORATION.**

3 Div. 643.

Supreme Court of Alabama.

Sept. 13, 1956.

Lange, Simpson, Robinson & Somerville, Birmingham, for appellee.

John Patterson, Atty. Gen., and H. Grady Tiller and Wm. H. Burton, Asst. Atty. Gen., for appellant.

LAWSON, Justice.

The State Department of Revenue, sometimes hereafter referred to as the De-

partment, found that for the five-year period beginning October 1, 1943, and ending September 30, 1948, the Pan-American Petroleum Corporation failed to pay to the State of Alabama the sum of $13,-858.55 due under the terms and provisions of § 634, Title 51, Code 1940. Based on such finding the Department entered a preliminary deficiency tax assessment against the said corporation for the amount found due. The assessment was made final after a hearing was had on the protest filed by the corporation against which the preliminary assessment was entered.

Subsequent to the time the preliminary assessment was entered but prior to the date on which it was made final, Pan-American Petroleum Corporation merged with another Delaware corporation to form Pan-Am Southern Corporation.

Pan-Am Southern Corporation took an appeal to the circuit court of Montgomery County, in equity, from the final assessment entered by the Department against Pan-American Petroleum Corporation. No question is raised as to this procedure, as it seems to be conceded that Pan-Am Southern Corporation became liable for any taxes due the State of Alabama by Pan-American Petroleum Corporation and that it has the right to appeal from the final assessment. We will, therefore, hereafter treat Pan-Am Southern Corporation as the taxpayer and will consider the final assessment as having been made against it.

Following a hearing where the evidence was taken orally in open court, the circuit court of Montgomery County, in equity, rendered a decree vacating and setting aside the assessment in its entirety.

From that decree the State of Alabama has appealed to this court.

Section 634, Title 51, supra, reads:

"Each person, firm, corporation, or agency selling illuminating, lubricating, or fuel oils at wholesale, that is to say in quantities of twenty-five gallons or more, shall pay to the department of revenue for the use of the state, within two weeks from the beginning of the fiscal year, the sum of one half of one percent on his gross sales for the preceding fiscal year, and such payment to the department of revenue shall be accompanied by a sworn statement verified by the person having knowledge of the facts showing the amount of the gross sales of such oils sold in the state during the preceding fiscal year. No county license shall be charged under this section. A copy of said statement shall at the same time be filed with the department of revenue. The books of such person so engaged in such business shall be accurately kept and shall show the date, character and quantity of such oils, received by him for sale in this state, and the name and post office address of the person from whom received, and said books shall also show the date, character and quantity of each sale made, together with name and address of the person to whom sold; and when consigned to an agent for sale in this state, the date, character and quantity of such consignment, together with the name and address of such agent, and place of consignment. Such books shall always be open to inspection of the department of revenue. Any person failing to make such sworn statement, or making a false statement, or failing to keep his books in substantial compliance with this section, shall be guilty of a misdemeanor and upon conviction therefor shall be fined not exceeding five hundred dollars, and also forfeit to the state three times the amount of said license on such gross sales, but no tax shall be paid to the county."

The provisions just quoted have been held to constitute the levy of a privilege or license tax on the business of selling illuminating, lubricating or fuel oils at wholesale, the amount of the license being measured by gross sales. Pure Oil Co. v. State,

244 Ala. 258, 12 So.2d 861, 148 A.L.R. 260; State v. Pure Oil Co., 256 Ala. 534, 55 So.2d 843.

During the period of time covered by the assessment, taxpayer was engaged in the business of selling oil products at wholesale in six states, including Alabama. It maintained its principal offices at New Orleans, Louisiana. However, it had facilities and installations in or near Birmingham, including a district office, a sales office, warehouses and storage tanks. Without question, a considerable volume of oil products of the kind covered by § 634, Title 51, supra, was sold at wholesale in and around Birmingham, such products being distributed from the warehouses and storage tanks so located. But the assessment here involved is not in any way based on those sales. It seems to be conceded by the parties that a wholesale license to sell oil products at wholesale, as required by § 634, Title 51, supra, was paid by the taxpayer for the years involved based on annual returns which correctly stated the gross sales of the products distributed from the warehouse and storage tanks located in or near Birmingham.

It is clear from the record before us that the State and the taxpayer entered into the trial of this cause in the court below in entire agreement on the point that the deficiency assessment under attack was based entirely on shipments of oil products made by the taxpayer from its refineries in Louisiana and Pennsylvania by common or contract carriers to various distributors in Alabama who were engaged in the business of reselling such products under written contracts with the taxpayer. However, during the course of the trial one of the taxpayer's distributors, who was called to the stand by the State, testified that some of the oil products which he purchased from the taxpayer during the time involved were shipped to his place of business in Montgomery by the taxpayer from Mobile. There was a stipulation to the effect that other distributors of taxpayer's oil products operating under similar contractual relationships would testify to the same effect if called as witnesses.

However, the decree under review clearly shows that the trial court set aside the assessment on a finding that it was based entirely on shipments from without the State. We quote from the decree:

"The Court is of the opinion that the said assessment made under the provisions of Title 51, Section 634, Alabama Code of 1940 is based wholly upon sales completed by delivery outside of the State of Alabama and such sales are not a proper basis for the assessment sought to be imposed. In view of this conclusion, a decision on the other issues made by the pleadings and proof is unnecessary. It is, therefore,—

"Ordered, Adjudged and Decreed by the Court" etc.

The State argues that in view of the testimony referred to above concerning alleged shipments to distributors from Mobile, the trial court erred in setting aside the assessment in its entirety, even though the decree be correct, which the State, of course, does not admit, concerning shipments from without the State. We cannot agree. The testimony of the distributor that he received shipments in the manner indicated does not show that any of such shipments were involved in the assessment with which we are presently concerned. On the other hand, there is evidence going to show that the assessment covered only shipments of oil products from Louisiana and Pennsylvania and also that the distributor received no oil products from taxpayer the shipment of which originated in Mobile. We have heretofore shown that the testimony in this case was taken orally before the trial court and, hence, we are governed by the presumption in favor of the trial court's findings of fact.

We will proceed, therefore, to consider the other questions in the light of the fact that the only sales which resulted in the

deficiency assessment were of oil products shipped by the taxpayer from refineries in Louisiana and Pennsylvania by common or contract carrier truck lines to distributors in Alabama engaged in the business of re-selling such products under written contracts with the taxpayer.

We construe the decree of the trial court as holding (1) that § 634, Title 51, supra, by its terms simply does not apply to the sales of oil products where the title passes from the seller to the purchaser outside the State of Alabama, and (2) that the title to all of the oil products the sales of which were made the basis of the deficiency assessment against the taxpayer passed from the taxpayer to the distributors beyond the boundaries of this state.

■■■■■ We are in accord with the construction which we understand the trial court to have placed on § 634, Title 51, supra. It is true that the first part of the section does not specifically confine the measurement of the tax to gross sales in Alabama, saying merely "on his gross sales for the preceding fiscal year." But the requirements of the section as to the contents of the sworn statement which is to be filed at the time of the payment of the tax shows, in our opinion, that only sales in this state were intended by the legislature to be used as a yardstick in determining the amount of the tax. We feel that it would do violence to the long-established rule that taxing statutes of doubtful effect are to be construed in favor of the taxpayer and against the taxing authority to hold that the legislature in enacting the provisions of law now codified as § 634, Title 51, supra, intended that the tax be measured on all gross sales whether made in this state or not and yet require the taxpayer to accompany his payment with a sworn statement showing only the amount of the gross sales of "such oils sold in the state during the preceding fiscal year."

However, we do not think the rule of statutory construction referred to requires or justifies the interpretation which the taxpayer insists should be placed on § 634, Title 51, supra, which is to the effect that the sales of oil products shipped by a seller directly to a purchaser by carrier in interstate transportation were not intended to be included in the measure of tax imposed by § 634, Title 51, supra, no matter where the title passed. The argument is made by the taxpayer that the sales the statute was directed at and concerned with are only of oil products first received by it in Alabama for sale in its purely local business.

In construing § 634, Title 51, supra, as having no application except where title to the oil products passes in this state, we have not overlooked the fact that taxing authorities may in some instances legally require a business license of concerns doing business within its borders even though certain incidents of the doing of the business may occur or be completed outside of the locale when important or substantial incidents of the business are carried on therein. Sanford Service Co., Inc., v. City of Andalusia, 256 Ala. 507, 55 So.2d 856; Graves v. State, 258 Ala. 359, 62 So.2d 446. See Norton Co. v. Department of Revenue of State of Illinois, 340 U.S. 534, 71 S.Ct. 377, 95 L.Ed. 517. But in the statute of instant concern the legislature has used the words "sold in the state" and we feel that those words limit the sales which can be used in measuring the tax to those where the transfer of title to the oil products occurred within the boundaries of this state. So whatever power the legislature may have had to provide for the measurement of the tax according to certain incidents which may occur in this state, Sanford Service Co., Inc., v. City of Andalusia, supra; Graves v. State, supra, or to authorize the tax to be measured according to the sale of oil products made outside of Alabama as well as those sold in Alabama, Standard Oil Co. v. Department of Finance, 383 Ill. 136, 48 N.E. 2d 514, and Arizona State Tax Commission v. Ensign, 75 Ariz. 220, 254 P.2d 1029,

the fact remains that it has not used that method.

We come now to a consideration of the question as to whether the trial court held correctly that the title to the oil products passed to the purchasers beyond the boundaries of this state.

All of the transactions on which the assessment was based, as we have heretofore shown, were instances where the products sold originated in another state and were moved by truck lines operating either as common or contract carriers to the purchasers' places of business in this state. And all of the sales in question were based on orders placed by the purchasers, the distributors, under written contracts which they had previously entered into with the seller, the taxpayer. The distributors did not deal directly with the taxpayer's principal offices in New Orleans. They sent their orders for oil products to the taxpayer's office in Birmingham, from which they were "funneled" to the New Orleans office where they were accepted and where the machinery was set in motion leading to the filling of the orders.

At the time the products were turned over to the carriers in the shipping states, the seller delivered to the carriers straight bills of lading showing consignment of the products to the distributor with destination being the distributors' plants in Alabama and showing that freight was prepaid by the seller, the taxpayer. The payment of freight by the seller was in accord with the contracts between it and the distributors, all of which showed that the prices agreed upon were "delivered prices." Invoices were mailed to the distributors on the day of shipment or on the following day containing language to the effect that the shipments were f.o.b. points of destination in Alabama.

█ The general rule is that the delivery of personal property by the seller to a common carrier to be conveyed to the purchaser is a delivery to the purchaser and that the title to the property vests in the purchaser immediately upon its delivery to the carrier. Kelite Products, Inc., v. Binzel, 5 Cir., 224 F.2d 131; Alabama Great Southern R. Co. v. H. Altman & Co., 191 Ala. 429, 67 So. 589; Department of Revenue v. Jennison-Wright Corp., 393 Ill. 401, 66 N.E.2d 395. That general rule and some of the exceptions thereto are stated in the following language which we quote from § 52, Title 57, Code of 1940, § 46, Uniform Sales Act, Act 484, approved July 22, 1931, General Acts 1931, p. 570:

"Where, in pursuance of a contract to sell or a sale, the seller is authorized or required to send the goods to the buyer, delivery of the goods to a carrier, whether named by the buyer or not, for the purpose of transmission to the buyer is deemed to be a delivery of the goods to the buyer, except in the cases provided for in section 25, rule 5 of this title, or unless a contrary intent appears * * *."

The pertinent provisions of § 25, Title 57, Code 1940, Section 19, Uniform Sales Act, supra, including Rule 5 of that section, are:

"Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer. * * * Rule 5. If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon."

As we have heretofore shown, the contracts under which the orders were placed and the products shipped called for the payment of the freight by the seller, and the invoices showed that the products were shipped f. o. b. points of destination in Alabama, hence it is contended by the State that under the provisions of Rule 5, § 25, Title 57, supra, the title to the oil products passed to the buyer in this state.

But the time at which the property is to pass to the buyer has always depended upon the intention of the parties and the provisions of the Uniform Sales Act expressly reaffirm that rule. The presumption which Rule 5 of § 25, Title 57, supra, creates by the terms of that section does not apply if a different intention appears.

In our opinion, the prepayment of freight under the facts of this case amounted to no more than a method of adjusting the price so that the distributors wherever located and however distant from the points of shipment might be able to resell the products at the same price except for local taxes, and we are clear to the conclusion that the statement in the invoices to the effect that the shipment was f. o. b. points of destination was but a recognition of the obligation of the seller, the taxpayer, to pay the freight, and, hence, those statements should not be considered as showing when the parties intended title to pass. These circumstances, in our opinion, refute any inference or presumption created by Rule 5, § 25, Title 57, supra, to the effect that by paying the freight and absorbing it, the taxpayer intended that there was a duty to deliver at destination and that consequently title did not pass until the products reached their destination in Alabama.—Lansdowne Distillery, Inc., v. Duggan's Distillers Products Corp., 192 Md. 540, 64 A.2d 727. See 77 C.J.S., Sales, § 143, p. 860; 46 American Jurisprudence 609, Sales, § 442.

But we think there is still another circumstance which destroys any inference that by paying the freight and absorbing it, the taxpayer, the seller, intended that it was its duty to deliver at destination and that, hence, title did not pass until the products reached their destination in Alabama. That circumstance is that the contract under which these products were ordered and shipped contained the provision: "Car contents shall be at Distributor's risk as soon as car is delivered to the railroad for shipment. Oils and greases in less than carload lots shall be at Distributor's risk as soon as delivered to the carrier for shipment."

The buyer and the seller have the power to contract that title is in one while risk is in the other. § 28, Title 57, Code 1940. But generally speaking, the placing of the risk upon one is not in harmony with placing the ownership in the other and we do not feel that such a construction should be placed upon a contract except where it is clear and unmistakable that such was the intention of the parties. In this case we can find no logical reason for the parties to have intended that the title should remain in the seller but the risk of loss be entirely upon the buyer upon delivery of the products to the carrier. In our opinion, under the circumstances of this case, the express agreement that the products were at the risk of the buyer is entirely inconsistent with an intention that the seller was under a duty to deliver or guarantee delivery to the buyer at his place of business in Alabama. See Electric Storage Battery Co. v. District of Columbia, 81 U.S.App.D.C. 135, 155 F.2d 867; Glanzer v. J. K. Armsby Co., 100 Misc. 476, 165 N.Y.S. 1006.

Enough has been said to show that we are in accord with the holding of the trial court to the effect that the title to the oil products passed outside the State of Alabama.

The construction which we have placed on § 634, Title 51, supra, makes it unnecessary for us to deal with the question as to whether the statute would be violative of the commerce clause of the Federal Constitution if construed to apply to sales made without the State of Alabama. American Surety Co. of New York v. King, 237 Ala. 510, 187 So. 458.

The decree of the trial court is affirmed.

Affirmed.

LIVINGSTON, C. J., and STAKELY and MERRILL, JJ., concur.